# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00880-COA

**J. LARRY BUFFINGTON**                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                 **APPELLEE**

DATE OF JUDGMENT:               05/09/2019
TRIAL JUDGE:                    HON. DAVID SHOEMAKE
COURT FROM WHICH APPEALED:      SMITH COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         CHRISTOPHER RANDALL PURDUM
ATTORNEYS FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                BY: MATTHEW WYATT WALTON
                                    ASHLEY SULSER
NATURE OF THE CASE:             CIVIL - OTHER
DISPOSITION:                    REVERSED AND REMANDED - 01/05/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     During a May 6, 2019 pretrial conference conducted in the Smith County Chancery Court, Judge David Shoemake found J. Larry Buffington in criminal contempt of court. On May 9, 2019, Judge Shoemake entered an order, nunc pro tunc to May 6, 2019, holding Buffington in direct criminal contempt and sentencing Buffington to serve twenty-four hours in the Smith County jail. Judge Shoemake attached exhibits to the May 9, 2019 order that included the transcript and audio recording from the May 6, 2019 pretrial conference. The attached exhibits also included transcripts and audio recordings from prior proceedings and copies of previously filed court documents that Judge Shoemake referenced during the

contempt proceedings.

¶2. On appeal, Buffington argues that Judge Shoemake erroneously held him in contempt, and he asks this Court to reverse Judge Shoemake's order. Buffington also filed a motion to strike any audio recordings and exhibits attached to the May 9, 2019 contempt order that pertained to proceedings other than the pretrial conference on May 6, 2019. Buffington's motion was passed for consideration with the merits of this appeal.

¶3. In holding Buffington in direct criminal contempt, Judge Shoemake discussed at length the exhibits that pertained to the prior proceedings and filings. Judge Shoemake then made the evidence part of the record during the May 6, 2019 contempt proceedings and attached the evidence as exhibits to the contempt order. Because we consider the evidence as part of the record on appeal, we deny Buffington's motion to strike.

¶4. Upon review of the transcript and audio recording of the proceedings, we note that Buffington's alleged contemptuous conduct presented a combination of both direct and constructive criminal contempt. As a result, Buffington was entitled to certain due-process safeguards, including notice of the specific charges against him and a separate hearing on those charges. We therefore reverse the judgment holding Buffington in direct criminal contempt and remand this case to allow another judge to conduct a de novo hearing to determine whether Buffington's conduct and filings before Judge Shoemake amounted to criminal contempt. In so doing, we make no determination as to whether Buffington's behavior before Judge Shoemake on May 6, 2019, or his behavior and filings before Judge Shoemake on previous occasions, warrant a finding of criminal contempt. In addition, we

make no determination with regard to any matters that fall under the purview of either the Mississippi Bar Association or the Mississippi Commission on Judicial Conduct.

**FACTS**

¶5. After taking office in 2011, Judge Shoemake began presiding over child-custody matters between Lauren Blakeney and Verba Shoemaker. In February 2017, Shoemaker filed a petition to modify child custody. Shoemaker asserted that Blakeney had filed false child-abuse allegations against him, and he requested that the chancellor award him sole custody of the parties' minor child. At the time the 2017 child-custody proceedings began, Eugene Tullos and John Tullos represented Blakeney, and Corey Gibson represented Shoemaker. After a telephonic conference with the parties, Judge Shoemake entered a March 6, 2017 temporary order appointing a guardian ad litem (GAL) for the minor child. Judge Shoemake ordered the GAL to investigate the abuse allegations, to provide a written report of her findings, and to make a recommendation based on her findings.

¶6. On May 2, 2017, Judge Shoemake held a conference with the GAL and the parties' attorneys. Following the conference, Shoemaker's attorney prepared and submitted an order for Judge Shoemake to sign. The May 8, 2017 order acknowledged that the Mississippi Department of Child Protection Services (CPS) had opened a case in response to the child-abuse allegations. In light of the GAL's appointment, however, the order relieved CPS of any further investigative duty and authorized the GAL to continue with her investigation.

¶7. The following year, on May 8, 2018, the parties and their attorneys appeared before Judge Shoemake and announced that they had agreed to modify child custody. The parties

3

submitted an agreed order signed by each of them as well as their respective attorneys. The June 8, 2018 agreed order stated as follows:

> [T]he parties have acknowledged and agreed that a substantial and material change in circumstances adverse to the best interest of the minor child . . . has occurred which necessitates a change in custody. The material and substantial change is a result of Lauren Blakeney . . . making numerous allegations against the father of the child that were ultimately unsubstantiated and then subjecting the child to testifying in Justice Court. The . . . [GAL] further investigated the facts and circumstances of this case and recommended in her report that Verba Allen Shoemaker Jr. be granted full custody of the minor child . . . .

The agreed order granted the parties joint legal custody of the minor child. Shoemaker received sole physical custody while Blakeney retained visitation rights. The agreed order also released the GAL from her duties.

¶8. In December 2018, Buffington began representing Blakeney in the custody matter. On December 26, 2018, Buffington filed a petition on Blakeney's behalf that asserted a new claim of child abuse against Shoemaker and stated that "the child's best interest has been ignored . . . ." The petition requested that the chancellor grant Blakeney temporary physical custody of the minor child and allow CPS to investigate the new abuse allegation. The petition also sought to modify child custody. On February 15, 2019, Buffington filed an amended petition on Blakeney's behalf.

¶9. In April 2019, Buffington filed a civil lawsuit against Judge Shoemake on behalf of clients he represented in a different matter. On May 3, 2019, Buffington filed a motion for Judge Shoemake to recuse himself from the custody dispute between Blakeney and Shoemaker. The recusal motion cited the civil lawsuit as a basis for Judge Shoemake's recusal. On May 5, 2019, Buffington had Judge Shoemake served with a summons for the

4

civil lawsuit.

¶10.     On May 6, 2019, Judge Shoemake conducted a pretrial conference on the ongoing child-custody matter between Blakeney and Shoemaker. During the pretrial conference, Judge Shoemake inquired about the language used in the December 26, 2018 petition Buffington had filed on Blakeney's behalf. Judge Shoemake asked whether Buffington had intended to imply in the petition that Judge Shoemake had ignored the best interests of the minor child or whether he (Judge Shoemake) had misread the petition. Buffington responded his intent was to point out that Judge Shoemake's previous orders had instructed CPS not to investigate any more claims from his client and had left the parties without a GAL. Judge Shoemake stated that every order entered in the matter prior to Buffington's involvement had been agreed to by both parties. Buffington disagreed with Judge Shoemake and asserted that the order releasing the GAL had only been signed and submitted by Shoemaker's attorney. Judge Shoemake instructed Buffington to keep his voice down, and Buffington replied that he did not appreciate the manner in which Judge Shoemake was speaking to him. Judge Shoemake again instructed Buffington to keep his voice down and warned Buffington that he had "just crossed the line." Judge Shoemake further stated, "You've crossed the line three or four other times with me, but this is going to be the last time you cross the line, so don't do it."

¶11.     Immediately following Judge Shoemake's warning, Buffington referenced the recusal motion he had filed against Judge Shoemake in the custody dispute and the recent lawsuit he had filed against Judge Shoemake in another matter. Although the record reflected that

5

Judge Shoemake had been served with a summons for the lawsuit the previous day, he had not yet been served with Buffington's recusal motion. With regard to the two filings, Buffington stated:

> While we're here, though, . . . we filed a motion for you to recuse on Friday after we were hired to file a lawsuit against you for the costs that [were] incurred when you operated outside your judicial duties, so that is pending. And I know you know it because you got served.

> Also, due to the fact that we had to go to the Supreme Court to get you to do what you were supposed to do to begin with as far as in another matter, not in this matter, when you recused and then tried to unrecuse yourself for some reason, I have no idea.

¶12.   Judge Shoemake warned Buffington that he was once again crossing a line by bringing up outside matters. Judge Shoemake stated that Buffington was not only "being disrespectful to the Court" but was also "disrupting this forum and . . . trying your best to impugn the integrity of the Court." After Buffington again disagreed that he was being disrespectful, Judge Shoemake asked Buffington "not to cross [the line] anymore" but to proceed with his argument. Judge Shoemake further told Buffington, "[Y]ou've already crossed the line twice in th[e] five minutes that we've been here. And I'm asking you not to cross it anymore, but if you choose to, then that's your business." Buffington once more disagreed with Judge Shoemake's statements that he had crossed any lines.

¶13.   Following this exchange, Judge Shoemake again referenced Buffington's December 26, 2018 petition and stated that one of the paragraphs had implied that he had issued an improper and illegal order. After recounting some of the case's procedural history, Judge Shoemake stated:

My point is, the language in your petition reads as if I have ruled and ordered [the GAL] appointed; I have ruled and ordered []CPS [to] not be involved in this case; that I have neglected the best interest of the child[;] and all of that, the way it's written is disparaging and disrespectful to the Court.

¶14. Buffington began to defend the wording of his December 26, 2018 petition when Judge Shoemake interrupted and again warned that Buffington was using an "argumentative tone and behavior" that was "disrespectful to the Court." The following exchange ensued:

BUFFINGTON:   I don't see how it's disrespectful when I'm responding to what you're putting on the record to make sure if I have to go to the Supreme Court like I did on the recusal matter that it's in there, what needs to be put in there. And . . . so, no, I'm not.

THE COURT:   And further, your speech about the lawsuit you filed against me and all of that, . . . that is disrespectful. There's no necessity for you to get in here and remind the Court that you've just sued the Court and you just had the Court served with a summons. That is highly disrespectful[,] and it insults the dignity of this Court.

BUFFINGTON:   I don't know how you say that. All I said was we filed a motion to recuse based on that. And we put it before you and, of course, not being disrespectful, but more than likely we would have gotten an order from any other judge we have sued going ahead and recusing himself from all of our cases because it's quite obvious that a regular person on the street would look at that and wonder how you could treat us fair[ly]. And then you're here, you were prepared to try to say I've been disrespectful. I don't think I've been disrespectful. I may have raised my voice once or twice, but it was not disrespectful. You have determined that I've been disrespectful.

¶15. Buffington and Judge Shoemake continued to disagree about the circumstances surrounding the May 8, 2017 order Judge Shoemake had signed that allowed CPS to

7

withdraw from investigating the prior abuse allegations. After Judge Shoemake once again stated that Buffington was crossing the line and being disrespectful, Buffington responded:

> Okay. Well, do whatever you've got to do then. I'll go to the Supreme Court if I have to. I've done it once[,] and I will do it again. I don't think I have [been disrespectful]. I think the record will reflect that. You are the one [who is] trying to create a problem, not me. All I have done is apprise you of where we are. After you put stuff on the record, I responded to show I don't care who presented the [May 8, 2017] order to you, to where what you said was not entirely correct because you represented that all the parties were present. [CPS] was never present. Never.

¶16. Following Buffington's comments, Judge Shoemake held Buffington in direct criminal contempt. In so doing, Judge Shoemake read into the record several prior instances where Buffington's behavior had also been argumentative and disrespectful. These prior instances included hearings in March 2018, June 2018, and April 2019 in different matters as well as an April 2019 hearing on the proceedings between Blakeney and Shoemaker. In referencing these prior instances, Judge Shoemake stated that his recitation of Buffington's prior conduct was simply "for background and history purposes" and did not serve as the basis for the criminal-contempt holding. Instead, Judge Shoemake stated that he was holding Buffington in direct criminal contempt for Buffington's disrespectful conduct, language, tone of voice, and accusations during the present proceedings, which Judge Shoemake found had disrupted the pretrial proceedings, demonstrated disrespect, and attacked his integrity.

¶17. By order entered May 9, 2019, nunc pro tunc to May 6, 2019, Judge Shoemake ordered Buffington to serve twenty-four hours in the Smith County jail and set Buffington's bail at $1,000. As an exhibit to his order, Judge Shoemake attached the May 6, 2019 audio recording and transcript. Judge Shoemake also attached to his order all transcripts and audio

8

recordings from prior court proceedings, as well as any previously filed court documents, that he referenced during the May 6, 2019 contempt proceeding. Aggrieved, Buffington appeals from the May 9, 2019 order holding him in contempt of court. Buffington also moved to strike all exhibits to the May 9, 2019 order other than the audio recording and documents from the May 6, 2019 pretrial conference. As stated, we deny the motion to strike.

**DISCUSSION**

¶18. Buffington argues that his conduct during the May 6, 2019 pretrial conference failed to justify a holding of direct criminal contempt and that he received no notice of the criminal proceedings against him. Buffington contends that Judge Shoemake actually based the contempt holding on previous instances of alleged contemptuous behavior and on previously filed documents with which Judge Shoemake took issue. Asserting that all his alleged contemptuous conduct occurred outside Judge Shoemake's presence and prior to the May 6, 2019 pretrial conference, Buffington asks this Court to reverse the order holding him in direct criminal contempt.

¶19. With regard to contempt matters, "the standard of review depends on the classification of the contempt citation." *Hayes v. Hayes*, 281 So. 3d 1002, 1008 (¶20) (Miss. Ct. App. 2019) (quoting *C.W. v. Lamar County*, 250 So. 3d 1248, 1252 (¶9) (Miss. 2018)). "[W]hen reviewing a citation for criminal contempt," this Court does not apply the manifest-error rule but instead "will proceed ab initio and will determine on the record whether the person is guilty of contempt beyond a reasonable doubt." *Id.* (quoting *C.W.*, 250 So. 3d at 1252 (¶9)). "[T]he party asserting that contemptuous conduct has occurred" bears "[t]he burden of

9

proof[,]" and "in a proceeding for criminal contempt, evidence of guilt must be established beyond a reasonable doubt." *Spore v. State*, 214 So. 3d 223, 226 (¶8) (Miss. 2017) (quoting *In re Smith*, 926 So. 2d 878, 886 (¶9) (Miss. 2006)).

¶20. "Two forms of criminal contempt exist: direct and constructive." *Latham v. Latham*, 261 So. 3d 1110, 1112 (¶8) (Miss. 2019). "[D]irect criminal contempt involves words spoken or actions committed in the presence of the court" while "[c]onstructive contempt involves actions which are committed outside the presence of the court." *Harris v. State*, 224 So. 3d 76, 81 (¶22) (Miss. 2017) (emphasis omitted) (quoting *Corr v. State*, 97 So. 3d 1211, 1214 (¶8) (Miss. 2012)). Because "direct criminal contempt takes place in the very presence of the judge making all the elements of the offense personal knowledge[,]" the "[p]unishment for direct contempt may be meted out instantly by the judge in whose presence the offensive conduct was committed." *Id.* at (¶23) (emphasis omitted) (quoting *Corr*, 97 So. 3d at 1214 (¶8)). By contrast, when constructive criminal contempt is involved,

> defendants must be provided with procedural due process safeguards, including a specification of charges, notice, and a hearing. We also have found that in cases of indirect or constructive criminal contempt, where the trial judge has substantial personal involvement in the prosecution, the accused contemptor must be tried by another judge.

*Id.* at (¶21) (citations and internal quotation marks omitted). Thus, if Buffington's conduct "actually constituted constructive criminal contempt, his due process rights would guarantee him more than the immediate sentence he received, including a different judge to hear the contempt proceedings." *Id.* (quoting *In re Smith*, 926 So. 2d at 888 (¶14)).

¶21. Appellate courts "normally favor finding that the contemnor's actions involved

10

constructive contempt when there is a legitimate issue as to whether the contemnor has committed constructive or direct contempt since constructive contempt requires a specification of charges, notice[,] and a hearing." *Purvis v. Purvis*, 657 So. 2d 794, 798 (Miss. 1994); *see also Wood v. State*, 227 So. 2d 288, 290 (Miss. 1969) (providing that any doubt regarding the classification of the alleged contemptuous conduct should be resolved in favor of constructive contempt, especially where the court charged the contemnor with criminal contempt).

¶22. In *Purvis*, the husband (Purvis) filed a pro se motion seeking the chancellor's recusal from the parties' divorce proceedings. *Purvis*, 657 So. 2d at 795. At the hearing on Purvis's recusal motion, the chancellor read aloud Purvis's motion and concluded that Purvis had made multiple unfounded and offensive allegations directed at the chancellor. *Id.* at 795-96. After reading aloud Purvis's motion, the chancellor gave Purvis the opportunity to expound on the allegations contained in his motion. *Id.* at 796. The chancellor refused to recuse himself and scheduled a subsequent hearing for Purvis to show why he should not be held in contempt for his remarks. *Id.* The chancellor found that Purvis had committed both direct and constructive criminal contempt. *Id.* The chancellor stated, however, that he was only holding Purvis in direct criminal contempt for "wrongfully attempt[ing] to, and intentionally tr[ying] to obstruct the proceedings of the court through his motion, through his telephone calls, through his statements at the hearing on the motion, and through his intentional failure to set the motion." *Id.*

¶23. In reviewing Purvis's appeal from the chancellor's judgment, the Mississippi Supreme

11

Court concluded that despite the chancellor's statement "that Purvis was being punished only for his direct criminal contempt, the basis and substance of the court's ruling was founded on constructive criminal contempt." *Id.* at 797. As the supreme court explained:

> The court in issuing its decision made reference to a single activity committed in the presence of the court, Purvis'[s] language in the courtroom as he personally argued his motion for recusal. Otherwise, Purvis'[s] actions were committed outside the presence of the court [(i.e., filing the recusal motion, calling the court, and failing to set the motion for hearing)]. The court expressly concluded that Purvis was guilty of constructive criminal contempt in addition to direct criminal contempt. The suspension of twenty days of his sentence was based upon Purvis'[s] promise not to engage in other acts classified as constructive contempt. The essence of the trial court's ruling was founded on constructive criminal contempt regardless of what acts the [c]hancellor said were attributed with the penalty imposed.

*Id.* at 797-98. The supreme court further found that because Purvis's alleged contempt was constructive and involved pointed personal attacks on the chancellor and his ability to perform his job, due process required another judge to preside over Purvis's contempt hearing. *Id.* at 798-99. The supreme court therefore reversed the judgment of contempt and remanded the case for further proceedings. *Id.* at 799.

¶24. Like the chancellor in *Purvis*, Judge Shoemake stated here that he was only holding Buffington in direct criminal contempt for Buffington's conduct during the May 6, 2019 pretrial conference. As the record reflects, however, "the basis and substance of the court's ruling" was much less clearly delineated and relied on alleged contemptuous conduct that presented a combination of both direct and constructive criminal contempt. *Id.* at 797. Similar to the facts presented in *Purvis*, Judge Shoemake began the May 6, 2019 pretrial conference by addressing language he found to be objectionable in Buffington's previously

12

filed petition. Judge Shoemake referenced the portion of the petition at issue and then asked whether he had misinterpreted Buffington's words. Later in the exchange, Judge Shoemake again referenced Buffington's petition and stated that the petition had been written in a manner that was "disparaging and disrespectful to the Court." At another point in the proceedings, Judge Shoemake commented that Buffington's "speech about the lawsuit you filed against me and all of that, . . . that is disrespectful." Finally, in actually holding Buffington in direct criminal contempt, Judge Shoemake provided a detailed account of prior interactions with and documents filed by Buffington that Judge Shoemake believed displayed Buffington's argumentative and disrespectful behavior toward him. As noted, Judge Shoemake also attached the evidence of these prior interactions and filings as exhibits to the contempt order.

¶25. As in *Purvis*, much of the conduct that Judge Shoemake referenced during the contempt proceedings occurred outside Judge Shoemake's presence or prior to the May 6, 2019 pretrial conference. Because much of Buffington's alleged contemptuous conduct falls under the classification of constructive rather than direct criminal contempt, we conclude that Buffington was entitled to "more than the immediate sentence he received, including a different judge to hear the contempt proceedings." *Harris*, 224 So. 3d at 81 (¶21) (quoting *In re Smith*, 926 So. 2d at 888 (¶14)). We therefore reverse the judgment of criminal contempt and remand this matter for further proceedings.

## CONCLUSION

¶26. Because much of Buffington's alleged contemptuous conduct amounted to

13

constructive rather than direct criminal contempt, we reverse the judgment holding Buffington in direct criminal contempt. We further remand this case so that another judge may conduct a de novo hearing to determine whether Buffington's behavior and filings before Judge Shoemake amounted to contempt of court. As previously stated, we make no determination as to whether the behavior and filings at issue amounted to criminal contempt or as to any matters that fall under the authority of the Mississippi Bar Association or the Mississippi Commission on Judicial Conduct.

¶27. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**